**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**JUAN R. DIAZ-ROMAN,**

   **Plaintiff,**

   v.                                              **Civil No. 08-1420 (GAG)(MEL)**

**JOSE R. DENIS, et. al.,**

   **Defendants.**

**OPINION AND ORDER**

Plaintiff Juan R. Diaz-Roman ("Diaz") brings this complaint under Section 1983 of the Civil Rights Act of 1964, 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the U.S. Constitution, and Article 1802 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, § 5141, against several police officers and a priavte citizen co-defendant Miladys Dumeng-Rodriguez ("Dumeng"), in their personal capacity. Plaintiff seeks relief for the damages he suffered as a result of the alleged illegal search and seizure, false arrest and fabrication of charges undertaken by members of the Puerto Rico Police Department.

   Co-defendant Dumeng timely moves for summary judgment arguing that there is no causal connection between her conduct and the alleged constitutional violations and damages suffered by Plaintiff. (Docket No. 179 at 2.) Similarly, defendants Jose R. Denis-Tavales ("Denis"), William Ruiz-Borras ("Ruiz"), Guillermo Medina-Mantilla ("Medina"), Almerido Rosario-Nieves ("Rosario"), Ernie Matias-Bonilla ("Matias"), and Frankie Lopez-Rivera ("Lopez") (collectively "Officer Defendants") request summary judgment on the grounds that there is no causal relationship between their acts and Plaintiff's alleged deprivation of civil rights. After a thorough review of all the pleadings and pertinent law, the court **DENIES** Dumeng's motion for summary judgment (Docket No. 179) and **GRANTS in part and DENIES in part** Officer Defendants' motion for summary judgment. (Docket No. 184.)

**Civil No. 08-1420 (GAG) (MEL)**                    2

## I. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is genuine if it may reasonably be resolved in favor of either party at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II. Evidence Considered by the Court

Before setting forth the undisputed and relevant facts found, there is an authenticity issue that must be addressed by this court regarding the documents presented. "Documents supporting or opposing summary judgment must be properly authenticated." Carmona v. Toledo, 215 F.3d 124, 131 (1st. Cir. 2000) (citing Fed.R.Civ.P. 56(e)). To be admissible at the summary judgment stage, documents must be authenticated by, and attached, to an affidavit that meets the requirements of Rule 56(e). Unauthenticated documents, once challenged, cannot be considered by a court in

**Civil No. 08-1420 (GAG) (MEL)**               3

determining a summary judgment motion. See Asociacion de Periodistas de Puerto Rico v. Mueller, 529 F.3d 52, 57 (1st. Cir. 2008) (district court properly declined to consider DVD of local news program, which was submitted without any accompanying affidavits attesting to its authenticity); Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (purported copy of investigation file, which was unsworn and uncertified should not have been considered by court because, to be admissible at summary judgment stage, documents must be authenticated and attached to affidavit that meets requirements of Fed.R.Civ.P. 56(e)).

Moreover, a party must not "[overlook] the crucial point that documents do not automatically become a part of the record simply because they are the products of discovery." Maldonado v. Cooperativa de Ahorro, 685 F. Supp. 2d 264, 269 (D.P.R. 2010) citing Hoffman v. Applicators Sale and Service, Inc., 439 F.3d 9, 14 (1st. Cir. 2006). "If a party wishes the court to consider matters disclosed during discovery, he must take appropriate steps to have them included in the record: merely citing to pages of discovery materials not of record does not suffice." Id.

After a careful review of the record, this court finds that some of the exhibits presented by Plaintiff in support of his statements of fact lack authenticity. Unless admitted by the opposing party, the court did not consider the factual statements that were not properly authenticated with a supporting affidavit. Pursuant to the foregoing, some of the documents presented by Plaintiff, specifically some of the FBI Statements, are inadmissible for consideration at this summary judgment stage.[1]

### III.   Relevant Facts and Procedural Background

Consistent with the summary judgment standard, the court states the facts in the light most favorable to the plaintiff. See Iverson, 452 F.3d at 98. Additionally, in accordance with Local Rule 56, the court credits only facts properly supported by accurate record citations. See Local Rule 56(e). The court has disregarded all argument, conclusory allegations, speculation, and improbable

---

[1] The court will only consider the FBI Statements pertaining to Frankie Lopez-Bonilla, Juan L. Garcia, Julio Diaz-Roman, and Miguel A. Diaz-Caban as they are the only statements accompanied by a sworn statement. All other FBI statements submitted by Plaintiff failed to comply with Fed.R.Civ.P. 26.

**Civil No. 08-1420 (GAG) (MEL)**          4

inferences disguised as facts. See Forestier Fradera, 440 F.3d at 21; Medina-Muñoz v. R.J. Reynolds Tabacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

This case involves allegations of the fabrication of charges, illegal search and seizure, and false arrest by members of the Illegal Weapons Division and Anti Drug Division of the Puerto Rico Police Department ("PRPD") in Ponce and Aguadilla. Plaintiff avers that the present allegations, are part of a fabricated case which was eventually exposed through an intervention undertaken by the Federal Bureau of Investigation ("FBI"). The uncontested facts are as follows.

Dumeng and Colonel Jose Denis-Tavales ("Denis") knew each other since 2003 when Dumeng's former husband had introduced them. (Docket No. 204-2 at 7-8.) On April 12, 2007, Dumeng contacted Denis on his cellular phone. (Docket No. 198-2 at 5.) The content of said telephone conversation is unknown. In his deposition testimony Denis stated that, he received a phone call on April 12 from someone informing him that a lieutenant from the Aguadilla FURA[2] Maritime division had weapons in the house of a female friend and was dealing drugs. (Id. at 2.) Denis also testified that he later received more confidential information regarding illegal weapons possession by police officers. (Id. at 3.) He testified that the informant stated that the corrupt FURA lieutenant had moved the weapons out of his house but that Officer Diaz, of the PRPD, had two weapons in his house. Denis referred the confidential information to William Ruiz Borras ("Ruiz"), an Inspector for the Puerto Rico Police Department and the Director of the Bureau of Illegal Firearms. (Docket Nos. 198-2 at 3-4 and 204-2 at 16.)

Although Ruiz's office was located in San Juan, Puerto Rico, on April 12, 2007 he was visiting the Illegal Firearms division in Ponce, Puerto Rico. (Docket No. 198-3 at 3.) While visiting the Ponce division, Ruiz received the call from Denis regarding the confidential information. (Id. at 5.) In his deposition testimony, Ruiz stated that the confidential information referred exclusively to Diaz and his possession of two firearms. (Id.) Following Denis's instructions, Ruiz assigned the mission to the Ponce division instead of the Aguadilla division so as to avoid any conflicts or

---

[2] FURA is the Spanish acronym for a division of the Puerto Rico Police Department, the name of which can be translated as "Forces United for Rapid Action."

impairment of the mission. (Id.) Consequently, Ruiz assigned the investigation to Victor Rivera ("Rivera") who, in turn, assigned it to Rene Ortiz ("Ortiz"). In Ortiz's notes regarding the assigned mission, he indicated that Diaz had two silver firearms in the washing machine. (Docket No. 204-2 at 22.)

On April 13, 2007, Dumeng went to Diaz's apartment and at approximately 11:30 pm or 12 noon, she went to the gas station near a pizza shop in Isabela, Puerto Rico. (Docket No. 204-3 at 5-6.) This was the gas station where Diaz would be detained that same evening. Ruiz admitted in his deposition testimony that the informant said she would send Diaz to buy some pizzas that day. (Docket No. 204-2 at 26.)

In the early afternoon hours of April 13, Ortiz called Ruiz to notify him that he was having trouble locating the residence of Diaz. (Docket No. 198-3 at 4.) Ruiz then hurried into Denis's office to inform him about Ortiz's failure to locate the residence. (Id. at 8.) Denis called the confidential informant to ask whether she was willing to talk to Ruiz. After securing her cooperation, Ruiz called the female informant. (Id. at 9-10.) The female informant clarified the location of the house and also told Ruiz that Diaz had two firearms in the washing machine and marijuana. (Id. at 11.)

That same day, between 3:00 pm and 4:00 pm, Ruiz informed Denis that they had already obtained a search warrant and would search Diaz's house in the evening. (Docket No. 198-2 at 6.) Denis admitted in his deposition testimony that the search warrant had been obtained by an agent of the Drugs and Illegal Firearms division in Ponce and that the sworn statement used to obtain the warrant was signed by Ortiz. (Id. at 8, 14.) The search warrant was dated from April 13, 2007 and was signed in Ponce at 7:15 pm. (Docket No. 198-7 at 2.) The warrant was based on confidential information received by a male person regarding the sale of illegal weapons and drugs by some corrupt officers in the northern area of Puerto Rico, specifically, Diaz. (Id. at 1.)

Ruiz assigned Medina, from the Aguadilla division, as the operations coordinator of the mission. Although he was not in charge of the mission, Medina was the only high ranking officer in the mission. (Docket Nos. 198-3 at 12-13 and 198-4 at 7.) Since the Ponce team had the warrant, Medina was unaware of the subject or location of the search. (Docket No. 204-2 at 33.)

**Civil No. 08-1420 (GAG) (MEL)**               6

Nevertheless, Medina headed to Isabela, Puerto Rico with Lopez, from the Aguadilla Drugs division, and David Rodriguez ("Rodriguez"), a photographer, in his car. (Docket No. 198-4 at 4.) Medina received a call from Ruiz, informing him that he had to focus the search on the washing machine, under the mattress and in the closet. (Docket No. 204-2 at 39.) Meanwhile, Medina called Rosario who was a Maritime Coordinator for the Police Department in the area ranging from Arecibo to Fajardo. (Docket No. 198-5.) Medina informed him that he was in Isabela in search of an agent that worked for the Aguadilla Maritime division and asked Rosario to meet him at Diaz's residence. (Id. at 7.)

Between 8:00 pm and 8:30 pm, they met with the Illegal Firearms Division agents at a To-Go gasoline station on Road 112, in front of a pizzeria in Isabela, Puerto Rico. (Docket No. 204-1 at 16.) While at the gas station, Diaz arrived and offered to help. Despite replying that everything was fine, one of the Illegal Weapons agents identified Diaz as the target of their investigation, advised him that they had a search warrant against him, and seized his firearm. (Id. at 16.) Diaz then led them to his apartment and opened the rear door to let the agents in. (Id.) Lopez testified that Diaz was always present at the places where the agents were searching. (Id. at 17.) According to the FBI statement, Lopez found cocaine inside the box-spring of Diaz's bed and five bags with a "pink panther" label containing marijuana in the left pocket of Diaz's police uniform shirts. (Id.) Lopez claims that in the twenty years that he has worked in the Aguadilla Drug Division he has never seen, found or seized marijuana with a "pink panther" label. (Id. at 18.) After dismantling a washing machine, Lopez found bags of cocaine inside it. (Id. at 17.) Before leaving the apartment, Lopez claims that Diaz said no one else had keys to his apartment since he had changed the locks a week ago. (Id. at 18.)

The search concluded after drugs were found in the washing machine, in the pocket of one of Diaz's shirts, and under the mattress. (Docket No. 185-2 at 83-84.) Despite what was reported by the confidential informant, no firearms were found. (Docket No. 198-4 at 14.) In his deposition testimony, Diaz admitted that he did not know whether Dumeng or the Police planted narcotics in his apartment. (Docket No. 179-2 at 1-3.) He also admitted not having seen Dumeng giving any substance or package with narcotics to any agent. (Docket No. 185-2 at 6.)

Since only controlled substances were found at Diaz's apartment, Medina contacted Ruiz

**Civil No. 08-1420 (GAG) (MEL)**               7

who instructed him to order Lopez to serve the order. (Docket No. 198-4 at 14.) In his deposition testimony, Rosario admitted that he was present the night of the operative. (Docket No. 198-5 at 9.) As Rosario walked into the apartment, Diaz told him that he was being set up. (Id. at 8.) After the search warrant was executed, Ruiz contacted Denis to inform him of the findings. (Docket No. 198-2 at 7.) Subsequently, Denis contacted the Associate Superintendent, Ramon Ortega, seeking the intervention of the FBI on the matter. (Id. at 10.) Diaz was taken to a Judge who found probable cause for arrest based on marijuana and cocaine possession and set bail at $5,000 for each charge. (Docket No. 185-2 at 8.) Once Diaz was arrested, no further investigation was conducted against the alleged corrupt lieutenant in the FURA division. (Docket No. 204-2 at 27.) Matias, an officer in the PRPD, commenced an internal administrative investigation against Diaz. (Docket No. 204-3 at 30.)

On April 15, 2007, Dumeng showed up at Julio Diaz-Roman's house asking him where his brother (Plaintiff) was. After telling her that he did not know his whereabouts, Dumeng threatened Julio Diaz-Roman by telling him that "if he did not want to go through the same experience as his brother was going through, he should better tell her where was Diaz Roman." (Docket No. 204-1 at 33.) Plaintiff's brother was so upset about her threats that he filed a complaint against Dumeng with the PRPD.[3] However, the police never contacted him regarding said complaint. (Docket No. 216-2 at 3.)

On April 16, 2007, Denis received the report about the FBI intervention. (Docket No. 198-2 at 11.) Among other things, the report recommended the summary suspension of Diaz. Denis approved the recommendation and consequently Diaz was suspended. (Id. at 12.) Moreover, Medina recommended the summary expulsion of Diaz from the PRPD. (Docket No. 204-2 at 42.)

Months later, once the FBI intervened on the matter, FBI Special Agent Sergio Siberio pointed out to Ruiz that the search warrant contained some discrepancies. (Docket No. 198-3 at 16.) Ruiz informed Denis of said discrepancies and prepared a report on the defects. (Id. at 18.) The

---

[3] According to the FBI statement, the complaint number was 07-10-037-2853. (Docket No. 204-1 at 33.)

**Civil No. 08-1420 (GAG) (MEL)**                    8

report ordered a criminal and administrative investigation against Ortiz, the officer who had signed the sworn statement in support of the search warrant. (Id. at 19.) Due to the discrepancies between the dates on the search warrant and the dates the surveillance took place, disciplinary action was taken against Ortiz. (Docket No. 198-2 at 20.) During said intervention, the FBI interviewed those people related, directly or indirectly to the incident. Among those interviewed was Julio Diaz-Roman ("Julio Diaz"), the Plaintiff's brother, who indicated that Dumeng had visited him on April 15, 2007.

In November, 2007, Diaz was reinstated as an officer with the PRPD. However, Plaintiff alleges that he continued to be subjected to a hostile and intimidating environment. Specifically, he argues that Rosario appeared at his workplace on June, 9, 2009 and on several other occasions, conducting what appeared to be an investigation against him. (Docket No. 204-3 at 29.) Finally, Robin Withmore-Velazquez ("Withmore") admitted in his deposition testimony that Rosario, his supervisor, instructed him to not appear at the deposition or give his testimony. (Id. at 9.)

On January 14, 2010, Diaz filed an amended complaint seeking compensatory and pecuniary damages for violations of his constitutional rights. (Docket No. 130-2.) Specifically, Plaintiff alleged that the Defendants, under color of state law, deprived him of his constitutional rights. Moreover, he alleged that he was subjected to an illegal arrest and search and that the charges against him had been fabricated. (Id. at 2-3.)

On May 11, 2010, co-defendant Dumeng moved for summary judgment alleging that because of her lack of personal involvement, Plaintiff had failed to establish a causal link between Dumeng and his deprivation of rights. (Docket No. 179.) On May 12, 2010, Defendants also moved for summary judgment arguing that Plaintiff had failed to demonstrate a causal connection between them and the alleged acts in violation of Plaintiff's rights. (Docket No. 184.) Plaintiff opposed both motions arguing that: (1) Dumeng demonstrated a deliberate, reckless and callous indifference towards Plaintiff's rights when she personally set into motion the actions leading to the violation of Diaz's constitutional rights and (2) that Defendants' actions were taken with deliberate disregard for his federal rights. (Docket No. 203.)

IV. **Discussion**

### A. *Miladys Dumeng-Rodriguez's liability under Section 1983*

Co-defendant Dumeng avers that she did not participate, nor was personally involved, in the acts narrated in Plaintiff's complaint. Specifically, Dumeng contends that she was not a member of the Puerto Rico Police Department, that she did not participate in the seizure or fabrication of narcotic charges and that she did not present a complaint against Diaz for narcotics violation in State Court. (Docket No. 179 at 12.)

Plaintiff, on the other hand, avers that Dumeng was the person who set in motion all the actions taken by the high ranking officers in violation of his constitutional rights. Consequently, Plaintiff argues that Dumeng should be held liable under 42 U.S.C. § 1983 since she set the whole incident into motion. (Docket No. 203 at 9.) Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Under Section 1983, the plaintiff must allege the following: (1) that plaintiff was deprived of a federal right; (2) that the defendant who deprived him of that right acted under color of state law; and (3) that the defendant's alleged conduct was causally connected to the plaintiff's deprivation. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989); West v. Atkins, 487 U.S. 42, 48 (1988). A defendant in a Section 1983 action has acted under color of state law if he has abused power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." United States v. Classic, 313 U.S. 299, 326 (1941). Conversely, purely private conduct is not within the reach of the statute. Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122 (1st Cir. 1999).

Nonetheless, the Supreme Court has clarified that acting "'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State." Dennis v. Sparks, 449 U.S. 24, 27 (1980). By simply being a "willful participant in joint action with the State or its agents" a person can be held liable under Section 1983. Id. Moreover, "private persons, jointly engaged

with state officials . . . are acting 'under color' of law for purposes of § 1983 actions." Id. at 27-28. To this effect, "private actors may align themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp of § 1983." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253-54 (1st Cir. 1996). However, "only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961).

The evidence in the present case, when fairly construed in the light most favorable to Diaz, shows that Dumeng knew Denis since 2003 and over the course of time, maintained a fairly close relationship with him. (Docket No. 204-2 at 7.) Dumeng exchanged numerous calls with Denis in the days prior to Diaz's arrest and even contacted him on April 12, 2007. (Docket Nos. 198-2 at 5 and 204-3 at 28.) On that date, Denis claims he received the confidential information from a female voice regarding Diaz's alleged weapon possession. (Docket No. 198-2 at 3.) Moreover, on April 13, 2007, Dumeng went to Diaz's apartment in the morning and then went to the gas station where Diaz would later be detained. (Docket No. 204-3 at 2-3, 5-6.) Two days later, Dumeng went to Plaintiff's brother's house looking for Plaintiff. At that time, she threatened Plaintiff's brother when he could not tell her where he was. (Docket No. 216-2 at 3.)

Although Dumeng did not participate directly in the search of Diaz's home and his arrest, evidence of prior phone conversations with Denis, when combined with her visit and threats made to Plaintiff's brother, creates a triable issue of material fact with regard to whether Dumeng acted in a way purposefully calculated to bring about Diaz's false arrest. See Wagenmann v. Adams, 829 F.2d 196, 210-11 (1st Cir. 1987) (Section 1983 verdict against private defendant upheld based on circumstantial evidence of conspiracy, namely, private defendant's close relationship with police chief).

The court finds, based on the foregoing information, that summary judgment is improper. A genuine issue of fact exists as to whether co-Defendant Dumeng acted under color of state law. As previously stated, "[f]or a claim to be actionable under [Section 1983], sufficient evidence must be presented showing that the action complained of was committed under color of state law and that said conduct worked a denial of rights secured by the United States Constitution." Romero-Barcelo

**Civil No. 08-1420 (GAG) (MEL)**                 11

v. Hernandez-Agosto, 75 F.3d 23, 32 (1st Cir. 1996). However, a rational trier of the facts could conclude that Dumeng's conversations with Denis, combined with threats to Plaintiff's brother, were part of a conspiracy with the other Defendants to provide false information about Diaz. See Commonwealth v. Camerano, 42 Mass. App. Ct. 363, 368 (1997) ("[A]n agreement to participate . . . might be inferred from evidence such as conversations.") Because "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions," this is an issue that precludes summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). Therefore, the court **DENIES** summary judgment as to Plaintiff's Section 1983 claims against co-Defendant Dumeng.

### B.   Police officer's liability under Section 1983

In their motion for summary judgment, Defendants aver that Plaintiff has failed to establish a causal connection between their acts and Plaintiff's claims of civil rights violations. (Docket No. 184.) Defendants argue that Plaintiff has failed to state a claim upon which relief can be granted under 42 U.S.C. § 1983. (Docket No. 184.)

A plaintiff cannot succeed in a Section 1983 action if he or she fails to demonstrate a causal connection between the state official's alleged wrongful action and the alleged deprivation. Parratt v. Taylor, 451 U.S. 527, 535 (1981). This causal connection may consist of direct acts by the defendant, or certain acts performed at the defendant's direction or knowledge and consent. See Rizzo v. Goode, 423 U.S. 362, 370 (1976). When finding liability based upon acts performed at a defendant's direction or knowledge and consent, proving causation requires plaintiffs to demonstrate three elements. See Gutierrez-Rodriguez, 882 F.2d at 562. Plaintiff must show (1) that each supervising defendant's acts or omissions caused the deprivation of the rights at issue; (2) that the supervising defendant's conduct or inaction was intentional, grossly negligent, or amounted to a reckless or callous indifference to the constitutional rights of others; (3) and that there is an affirmative link between the street level misconduct and the action, or inaction, of supervisory officials. See Velazquez-Martinez v. Colon, 961 F. Supp. 2d 362, 365 (D.P.R. 1997).

Plaintiff avers that, acting under the color of state law, the officers illegally obtained and executed a search warrant against him, fabricated a case against him, planted drugs in his residence,

**Civil No. 08-1420 (GAG) (MEL)**          12

and were recklessly indifferent towards his constitutional rights. (Docket No. 203.) Because Plaintiff's asserted Section 1983 claims are against various defendants for different acts, the court will address each defendant separately.[4]

### i.     Colonel Jose Denis-Tavales

Plaintiff alleges that Denis' conduct, was causally related to the alleged violation of Plaintiff's rights. Plaintiff contends that Denis demonstrated intentional and gross negligence in handling the confidential information received. (Docket No. 203 at 10.) According to Plaintiff, by referring the case to his subordinate, instead of to Internal Affairs, Denis ensured he was in control of the mission. Moreover, Plaintiff alleges that Denis' failure to provide a plan or briefing for the search against Diaz contravened with police protocol. (Id. at 11.) Finally, despite being in control of the mission, Denis did not conduct further investigation on the FURA lieutenant mentioned in the confidential information after Diaz was arrested. (Id.)

As previously stated, summary judgment must be denied when there is a genuine issue of material fact. Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995). In the present case, Defendant presents evidence showing that he received confidential information about Plaintiff through two telephone calls and that he referred said information for management. Plaintiff, however, brings forth sufficient evidence, through the deposition testimony of Denis and Ruiz, demonstrating that the information received did not refer exclusively to him, but also to a FURA lieutenant, although the investigation that ensued was solely focused on him. (Dockets Nos. 198-2 at 2, 204-2 at 27.) Moreover, Plaintiff contends that Denis, in order to maintain control of the mission, failed to follow protocol by not referring the confidential information to the appropriate division. (Docket No. 198-2 at 4.)

The evidence presented at this stage compels this court to hold that a genuine issue of material fact exists as to the content of the confidential information received and as to Denis' awareness of the falsity of said statements. See Gonzalez-Perez v. Davila, 680 F. Supp. 2d 347

---

[4] Defendant Frankie Lopez-Rivera was included in the motion, however, he failed to make any arguments on his behalf or proffer any evidence so as to compel this court to grant summary judgment.

(D.P.R. 2009) (denying summary judgment because there was a dispute of material facts regarding the potential awareness of events regarding the claim at hand). Accordingly, this court **DENIES** summary judgment with respect to the claims against Denis.

### ii.     Officer William Ruiz-Borras

Defendants aver that Ruiz's participation in the case was limited to channeling information and that he was not present during the search of Diaz's home. (Docket No. 184 at 9.) However, Plaintiff alleges that Ruiz's participation extended to receiving confidential information about the corrupt FURA lieutenant and failing to ensure a subsequent thorough investigation. Specifically, Plaintiff argues that the information about the corrupt FURA lieutenant was perpetrated as a mere pretext utilized to frame and prosecute him. (Docket No. 203 at 13.) Moreover, Plaintiff argues that Ruiz claimed to have already obtained the search warrant when in fact it had not yet been issued. (Id. at 14.)

The issue of who was the subject of the confidential information is critical to the resolution of this case. In his deposition testimony, Ruiz testified that he received a call from Denis regarding "some corrupt officers and a lieutenant" only to later testify that the confidential information he received was only about Diaz. (Docket No. 198-3 at 5.) Additionally, the record reveals that Ruiz called Denis between 3:00pm and 4:00pm on April 13, 2007 to let him know that they already had a search warrant, but according to record, the warrant was not signed until 7:15pm. (Docket Nos. 198-2 at 6 and 198-7 at 2.)

Plaintiff has demonstrated factual disputes with respect to the elements necessary to establish Ruiz's causal connection to Plaintiff's deprivation of constitutional rights. Ruiz's apparently contradictory statements, combined with his alleged false reporting of information, could provide a jury with sufficient evidence to infer that Ruiz was aware that the information he was channeling, which was ultimately used to procure the warrant, was false. Thus, acting with reckless indifference in violating Plaintiff's constitutional guarantees. See Burke v. Town of Walpole, 405 F.3d 66, 81 (1st Cir. 2005) ("A Fourth Amendment violation may be established if a [plaintiff] can show that officers acted in reckless disregard, with a 'high degree of awareness of [the] probable falsity' " of statements made in support of an arrest warrant." For said reason, the court **DENIES** summary

judgment as to Ruiz's liability under Section 1983.

### iii. Officer Guillermo Medina-Mantilla

Defendants move for summary judgment claiming that Medina was unaware of where the search warrant was to be executed and that while the search was being conducted, he mostly stayed outside of the apartment. In sum, Defendants argue that Medina and the Aguadilla division police officers were just giving support and cannot be held responsible for Diaz's deprivation of constitutional rights. (Docket No. 184 at 10.)

Plaintiff opposes these statements by presenting the deposition testimony of Denis. Denis testifies that Medina was in charge of the execution of the search warrant and subsequent arrest of Diaz. (Docket No. 204-2 at 13.) Moreover, through Medina's own testimony, Plaintiff demonstrates that Medina recommended Diaz's discharge from the Police Department. (Docket No. 204-2 at 42.)

Furthermore, Plaintiff points to inconsistencies between Medina and Rosario's statement regarding whether Diaz was ever handcuffed. (Docket 204-2 at 40.) Medina affirmed that Diaz was never handcuffed on the night of the incident. (Id.) Rosario, however, testified that he saw the Plaintiff handcuffed in his apartment. (Docket No. 198-5 at 8.) The First Circuit has held that inconsistencies in statements may suggest that defendants were aware that some illegality was involved in their acts. U.S. v. Perez-Melendez, 599 F.3d 31, 45 (1st Cir. 2010). When considering the inconsistent testimonies of the various co-defendants, the court finds that Plaintiff has presented sufficient evidence to create a triable issue of fact upon which a jury could infer that Medina acted with the requisite intent. Because there is a disputed issue of fact as to Medina's intent, the court **DENIES** summary judgment as to the Section 1983 claim against Medina.

### iv. Officer Almerido Rosario-Nieves

Defendants aver that Rosario-Nieves arrived at Plaintiff's residence after the search had concluded and the drugs had been seized. (Docket No. 184 at 10.) Specifically, they argue that his participation was limited to occupying the property of the State as is the norm in cases where a police officer is going to be criminally charged. (Id. at 10.)

In responding to Defendants' allegations that Rosario was not involved in Plaintiff's

deprivation of rights, Plaintiff has proffered the testimony of Rosario, in which he states that he saw Diaz handcuffed and ignored him as he told him "he was being set up." (Docket No. 198-5 at 8.)

Under Section 1983, a person "can be held liable . . . [for] omissions, amounting at the least to 'reckless' or 'callous' indifference to the constitutional rights of others." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989). In support of his claim, Plaintiff has proffered evidence which a reasonable jury could find indicates Rosario acted with the requisite intent to be held liable under Section 1983 for his omission to act.

Plaintiff offers his own testimony in which he describes Rosario's continued pursuit of the investigation against him. (Docket No. 204-3.)  This alleged independent investigation continued even after the charges against Diaz had been dropped. Evidence of similarly suspicious behavior is offered through the testimony of Rosario's subordinate, Robin Withmore. Withmore testified that following the filing of this case, Rosario instructed him not to appear at his deposition. (Docket No. 204-3 at 29.) These testimonial offerings are sufficient for a jury to infer that Rosario's behavior was indicative of an individual that was in fact aware of the fabrication of the case against Diaz. Plaintiff has generated sufficient evidence to create a question of material fact as to whether Rosario's failure to act was taken with reckless indifference to Diaz's rights. This showing is sufficient to establish a triable issue of material fact as to whether Rosario can be held liable under Section 1983 for his failure to act. See Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) ("The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists.")  Therefore, this court **DENIES** summary judgment with respect to the liability of Officer Rosario.

### v. *Officer Ernie Matias-Bonilla*

Defendants allege in their motion for summary judgment that Matias did not enter the residence of Plaintiff and only provided support in the perimeter area of the residence. (Docket No. 184 at 10.) Moreover, Matias declared in his *Statement Under Penalty of Perjury* that he only gave support in the perimeter area of Diaz's residence. (Docket No. 185-7 at 1.) In opposition to said allegations, Plaintiff avers that Matias wrote a report on the search findings, went into Plaintiff's apartment at the time of the search, and initiated an internal administrative investigation against him.

(Docket No. 204-3 at 29-30.)

Because Plaintiff has proffered his own testimony rebutting Matias's contention that he was not present during the search, and considering this evidence in the light most favorable to the nonmoving party, Plaintiff has created a genuine issue of fact as to whether Matias was present in Plaintiff's apartment while the search was being conducted.  The First Circuit has held that "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's [wrongdoing] can be held liable under section 1983 for his nonfeasance." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 207 n.3 (1st Cir. 1990).  Therefore, the court **DENIES** summary judgment with respect to the Section 1983 claims against Matias.

### C.  *Violation of Constitutional Rights*

Plaintiff grounds his Section 1983 claim on violations to his Fourteenth and Fourth Amendment rights.  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3 (1979)).  For this reason, the court will address the elements of the constitutional violation under the Fourteenth Amendment and the Fourth Amendment.

#### i.  *Fourteenth Amendment Substantive Due Process Claim*

Plaintiff claims that the alleged illegal search and seizure and false arrest violated his due process rights under the Fourteenth Amendment.  (Docket No. 130-2.)  Defendants move for summary judgment arguing that Plaintiff's claims should be dismissed since they are more appropriately brought under the Fourth Amendment.  (Docket No. 184.)

The Supreme Court has held that "not all actions of state officials that result in a loss of life, liberty or property are 'deprivations' within the meaning of the Fourteenth Amendment." Germany v. Vance, 868 F.2d 9, 17 (1st Cir. 1989).  Moreover, "because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically-intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Graham v. Connor, 490 U.S. 386, 395 (1989).  Similarly, alleged deprivation of substantive due process rights under the Fourteenth

Amendment based on excessive force or on malicious prosecution have been rejected. Estate of Bennett v. Wainwright, 548 F.3d 155 (1st Cir. 2008). To be actionable, a Section 1983 claim based on substantive due process deprivation must allege "conscience-shocking" conduct by defendants. Martinez v. Cui, 608 F.3d 54, 65 (1st Cir. 2010). "Only conscience-shocking behavior can be sufficiently arbitrary and egregious to be of constitutional significance." Id.

Defendants are correct in asserting that Plaintiff's allegations of an illegal search and arrest are only cognizable under a claim for violation of his Fourth Amendment rights. The present case involves allegedly malicious, but no conscience-shocking behavior, and no particularly violent acts. Therefore, the illegal search and seizure and false arrest claims preclude a substantive due process claim for conscience-shocking behavior. These allegations fall under the Fourth Amendment's prohibition against illegal searches and seizures. See Colon-Andino v. Toledo-Davila, 634 F. Supp. 2d 220 (D.P.R. 2009) (holding that allegations of police officers entering and searching plaintiff's apartment without a valid warrant and planting evidence constituted a plausible Fourth Amendment violation). Due to the fact that ". . . an alternative constitutional claim is available in this case, Plaintiff's substantive due process claim on this front cannot prevail." McLeod-Lopez v. Algarin, 603 F. Supp. 2d 330, 340 (D.P.R. 2009). Therefore, Plaintiff's substantive due process claims are **DISMISSED**.

### ii.     *Fourth Amendment Claims*

Plaintiff also premises his Section 1983 claim in alleged violations of his Fourth Amendment rights based on an illegal search and seizure and invalid search warrant. Plaintiff alleges that the search warrant issued was invalid since it contained some discrepancies with the search conducted and was based on false statements. In requesting the dismissal of Plaintiff's Fourth Amendment claims, appearing Defendants aver that they are not liable for a Fourth Amendment violation as they had nothing to do with obtaining the search warrant. (Docket No. 184 at 18.)

"A Fourth Amendment violation may be established if a [plaintiff] can show that officers acted in reckless disregard, with a 'high degree of awareness of [the] probable falsity'" of statements made in support of an arrest warrant. Forest v. Pawtucket Police Dept., 377 F.3d 52, 58 (1st Cir. 2004). Reckless disregard of the truth in the submission of a warrant application may be established

where an officer "in fact entertained serious doubts as to the truth of the allegations" or where "circumstances evidence[ed] obvious reasons to doubt the veracity of the allegations" in the application. United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002). "Allegations of intentional or reckless misstatements or omissions implicate the very truthfulness, not just the sufficiency, of a warrant application." Burke v. Town of Walpole, 403 F.3d 66, 82 (1st Cir. 2005).

If such allegations prove to be true, a court owes no deference to a magistrate's decision to issue an arrest warrant because the correct version of the material facts was never given to the magistrate. Id. Moreover, whenever the finding of probable cause is based on a search warrant that was based solely on false statements made in a supporting affidavit, the arrest violates the Fourth Amendment. See Aponte Matos v. Toledo Davila, 135 F.3d 182 (1st Cir. 1998) (reversing district court's decision granting summary judgment on the issue of whether police officers knowingly used false information in order to obtain the search warrant, thus, violating the Fourth Amendment).

In the present case, it is an uncontested fact that Ortiz was the agent who obtained the search warrant and signed its accompanying sworn statement. (Docket No. 198-2 at 8, 14.) The record also indicates that once the FBI noticed that the search warrant contained some discrepancies, disciplinary measures were taken against Ortiz. (Docket No. 198-3.) It is clear that none of the appearing defendants obtained the search warrant. However, the record also reveals that once Denis told Ruiz that Diaz was in possession of illegal weapons, Ruiz assigned Ortiz to the mission. (Docket Nos. 198-3 and 204-2.) The notes taken by Ortiz when he was assigned to the mission indicate that other police officers, namely Ruiz, provided the alleged false information that he later used to obtain the search warrant.

The law saddles Defendants with the burden of demonstrating the absence of any genuine issues of material fact at summary judgment. Plaintiff has presented sufficient evidence demonstrating the other Defendants' knowledge that the evidence contained in the search warrant was false. The evidence presented, specifically Ruiz's deposition testimony, raises factual disputes as to the Defendants' awareness of the falsity of the statements in support of the search warrant when the operative was carried out. Furthermore, with respect to the other Defendants, Plaintiff has proffered sufficient evidence that could lead a reasonable jury to conclude that all of the named

defendants acted in violation of Plaintiff's Fourth Amendment rights by either participating or failing to intervene in the alleged operative with the knowledge that such charges were fabricated against Plaintiff. Accordingly, this court **DENIES** summary judgment with respect to Plaintiff's Section 1983 claims against all the defendants premised on violations of his Fourth Amendment rights.

### D.    The State Law Claims

The federal claims that remain against Defendants and Dumeng arise out of the same "nucleus of operative fact" as Plaintiff's state law causes of action against them. See United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966); Rodriguez v. Doral Mortgage, 57 F.3d 1168, 1175 (1st Cir. 1995). As previously explained, Plaintiff has plead a plausible Fourth Amendment claim pursuant to Section 1983; therefore, "federal claims remain and supplemental jurisdiction over the Commonwealth action remains proper." Colon-Andino, 634 F. Supp. 2d at 238.

## V.    Conclusion

The court **DENIES** co-defendant Dumeng's motion for summary judgment (Docket No. 179) and **GRANTS in part and DENIES in part** Defendants' motion for summary judgment (Docket No. 184.) The only surviving claims before this court are Plaintiff's Section 1983 and Fourth Amendment claims.

**SO ORDERED.**

In San Juan, Puerto Rico this 2nd day of August, 2010.

                                        S/Gustavo A. Gelpí
                                        GUSTAVO A. GELPÍ
                                        United States District Judge